MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:     2022 ME 20
Docket:       PUC-20-198
Argued:       June 2, 2021
Reargued:     December 8, 2021
Decided:      March 31, 2022

Panel:        STANFILL, C.J., and MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.
Majority:     STANFILL, C.J., and MEAD, GORMAN, and JABAR, JJ.
Dissent:      CONNORS, HUMPHREY, and HORTON, JJ.

GENERAL MARINE CONSTRUCTION CORPORATION et al.

v.

PUBLIC UTILITIES COMMISSION

MEAD, J.

[¶1]  General Marine Construction Corporation (General Marine) and its principals, Roger and Dorothy Hale, appeal from an order of the Public Utilities Commission (PUC) declining to open a formal investigation into a water bill issued to General Marine by the Portland Water District (PWD).  Because the Commission's action was not an adjudication on the merits of General Marine's challenge to the bill but rather a decision *not* to proceed to a formal adjudicatory action, *see* 35-A M.R.S. § 1303(2) (2021),[1] General Marine's appeal

---

[1]  By statute, "[t]he commission may on its own motion . . . summarily investigate when it believes that . . . [a] charge is unjust or unreasonable . . . or [a]n investigation of any matter relating to a public utility should for any reason be made."  35-A M.R.S. § 1303(1) (2021).  Following its summary investigation, the Commission may proceed to a public hearing if it is "satisfied that sufficient grounds exist to warrant a formal public hearing as to the matters investigated."  35-A M.R.S. § 1303(2) (2021).

is not taken "from a final decision of the commission" pursuant to 35-A M.R.S. § 1320(1) (2021). For that reason, we dismiss the appeal.

## I. FACTS AND PROCEDURE

[¶2] General Marine owns Deakes Wharf on Commercial Street in Portland. Of the four buildings on the wharf, two are provided with metered water service by the PWD and a third has no water service. The water service provided to the remaining building, known as Building #4, is the subject of this appeal.

[¶3] In June 2018, the PWD issued General Marine a $15,803.70 "make-up bill" for unauthorized and unbilled water usage in Building #4 occurring during the previous six-year period, as provided by Chapter 660, § 8(E)(1)(a) of the Commission's Rules (entitled "Consumer Protection Standards for Water Utilities"). 65-407 C.M.R. ch. 660, § 8(E)(1)(a) (effective Aug. 28, 2011).[2] General Marine challenged the bill by filing a complaint with the Commission's Consumer Assistance and Safety Division (CASD).[3]

---

[2] From this point in the opinion, for the ease of the reader, specific sections of Chapter 660 of the Public Utilities Commission's Rules are cited as "PUC § __." *See* 65-407 C.M.R. ch. 660 (effective Aug. 28, 2011). Amendments not relevant to this appeal were made after the CASD issued its decision. *See infra* n.14.

[3] The Consumer Assistance and Safety Division was formerly known as the Consumer Assistance Division (CAD), which is the acronym used in Chapter 660 of the Commission's Rules. *See* P.L. 2015, ch. 8 (effective Oct. 15, 2015); *Savage v. Cent. Me. Power Co.*, No. BCD-CV-2017-61, 2018 Me. Bus. & Consumer LEXIS 29, at *9 (June 15, 2018); PUC § 2(H).

PUC § 13(G).  A Senior Consumer Assistance Specialist in the CASD conducted an informal investigation pursuant to PUC § 13(G)(2)[4] and sent General Marine a letter advising it of her conclusion that the PWD had complied with PUC rules in issuing the make-up bill.  *See* 35-A M.R.S. § 1303(1)(A), (C) (2021); PUC § 13(G)(4)(d).

[¶4]  General Marine appealed the CASD decision to the Commission, which reviewed the decision, upheld it, and declined to investigate the matter further.  *Gen. Marine Constr. Corp.*, Appeal of CASD Decision, No. 2019-00293, Order (Me. P.U.C. May 27, 2020); *see* PUC § 13(H).  The Commission denied General Marine's request for reconsideration, *Gen. Marine Constr. Corp.*,

---

[4] The rule provides:

**CAD Investigation of a Complaint**

The CAD will inform a utility that a complaint has been filed and the date of the filing by whatever means is acceptable to both the CAD and the utility, e.g., in writing, by telephone, by e-mail, or by fax.  The CAD will conduct an informal investigation of the complaint that may include:

a.  an informal meeting with the customer and/or the utility;

b.  a review of the written record of the utility's investigation required by Section 13(D) above; and

c.  an examination of other records, such as billing and payment information, notice of disconnection, or any other information that the CAD deems relevant to the complaint.

PUC § 13(G)(2).

4

Request For Reconsideration, No. 2019-00293, Order (Me. P.U.C. July 7, 2020), and General Marine appealed to us, *see* 35-A M.R.S. § 1320(1).

## II. DISCUSSION

[¶5]  The central question that must be answered in resolving General Marine's appeal is whether the CASD process is a voluntary, informal dispute resolution alternative to formal civil litigation, as the Commission contends and as its rules specify, *see* PUC § 13(G)(2), or whether it results in an adjudicatory, binding decision of the Commission and therefore requires due process akin to a formal court proceeding, as General Marine contends.[5]  We agree with the Commission's view of the process that it created and administers pursuant to statute.

### A.    Statutory and Regulatory Framework

[¶6]    In explaining our conclusion, we discuss the statutes and Commission rules that govern General Marine's challenge to its water bill. Viewed as a whole, they establish a comprehensive and coherent process for the informal resolution of utility billing disputes as a voluntary alternative to

---

[5] General Marine asserts that the CASD's investigation and the Commission's subsequent review of the CASD's decision required "the full panoply of quasi-judicial procedures, including but not limited to adequate notice, the right to present evidence and arguments, the right to call witnesses, the right to subpoena witnesses, the right to cross-examine, and the right to object to evidence, and the right to appeal."  (Statutory citations omitted.)

formal civil litigation. The Legislature has given the Commission broad authority to enact rules within its sphere of authority. *See* 35-A M.R.S. § 104 (2021) ("The commission has all implied and inherent powers under [Title 35-A], which are necessary and proper to execute faithfully its express powers and functions specified in this Title."); *see also* 35-A M.R.S. § 1301 (2021) ("Substantial compliance by the commission with the requirements of [Title 35-A] gives effect to all the commission's rules, orders and acts."). Acting pursuant to statutory authority, the process created by the Commission is as follows:

- When a customer disputes a utility bill, the customer is required to attempt to settle the dispute directly with the utility before filing a complaint with the PUC. 35-A M.R.S. § 1308 (2021); PUC § 13(G)(1). The utility, in turn, must have employees available to respond to questions from its customers and to resolve disputes.[6] PUC § 13(A).

---

[6] The PUC's requirement that the utility "provide[] the opportunity to talk to a live customer representative" who is trained to resolve disputes, PUC § 13(A), fully satisfies the due process standard announced by the United States Supreme Court in *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1 (1978). There, the Supreme Court held that "due process [in a utility termination case] requires the provision of an opportunity for the presentation to a designated [utility] employee of a customer's complaint that he is being overcharged or charged for services not rendered." *Memphis Light*, 436 U.S. at 3, 16. Consequently, "the failure to provide notice reasonably calculated to apprise [customers] of the availability of an administrative procedure to consider their complaint of erroneous billing, and the failure to afford them an opportunity to present their complaint to a designated employee empowered to review disputed bills and rectify error, . . . deprive[s] [them] of an interest in property without due process of law." *Id.* at 22.

The dissent makes the large inferential leap that the Maine Legislature, based on *Memphis Light*'s limited holding, must have intended "to meet the minimum federal constitutional demand for an informal hearing before the utility *and then additionally* to provide for an administrative appeal of the utility's decision capable of judicial review." Dissenting Opinion ¶ 50 (emphasis added). The dissent's inferential leap of faith provides vital support for its ultimate conclusions, but finds no concrete support in the record or elsewhere. If, so shortly after *Memphis Light* was decided, the

6

- If the customer is not satisfied with the utility's resolution of the customer's dispute, "the customer may appeal the decision to the commission." 35-A M.R.S. § 1308. By PUC rule, the "appeal" is assigned to the CASD for investigation, PUC § 13(E), (G), a process authorized by 35-A M.R.S. § 704(2) (2021) ("The commission shall adopt rules which provide a procedure for resolution by the commission or its delegate of disputes . . . .") and by 35-A M.R.S. § 1303(1) (2021), *see supra* n.1.[7]

- The CASD conducts "an informal investigation of the complaint that may include . . . informal[ly] meeting with the customer and/or the utility"; reviewing the utility's initial investigation; and "examin[ing] . . . any other information that the [CASD] deems relevant to the complaint." PUC § 13(G)(2). As the entity subject to PUC regulation,[8] the utility is required to provide the information requested by the CASD. PUC § 13(G)(3).

- The CASD's investigation results in a written decision within thirty days of the CASD receiving necessary information from the utility. PUC § 13(G)(4). The CASD "shall impose any just and reasonable requirements [on the utility] necessary to resolve the complaint." *Id.* The CASD may not mandate that the customer pay the disputed bill, although it may "determin[e] that a utility may proceed with disconnection in appropriate circumstances." PUC § 13(G)(4)(e). Because the dispute is resolved by a "delegate" of the Commission and not the Commission

Legislature intended what the dissent asserts, it would have said so, and could still do so at any time if it disagrees with the CASD process that the Commission has created.

[7] Although 35-A M.R.S. §§ 704(2) and 1308 (2021) use the word "appeal," they do not suggest or require that the summary investigation authorized by section 1303(1)—which follows an informal dispute resolution inquiry by the utility and not an adjudicatory decision—must contain the same procedural protections and formal process as does an appeal brought before a court. In the context of the complete process described in this section of the opinion, the term "appeal" is reasonably construed to mean a review by the PUC of the customer's billing dispute.

[8] It is consequential to note that it is the utility, not the customer, that is subject to the PUC's authority. *See* 35-A M.R.S. §§ 101, 103(2)(A) (2021) ("All public utilities . . . are subject to the jurisdiction, control and regulation of the commission . . . ."). Thus, although the PWD was required to participate in the CASD inquiry, General Marine could have elected to bypass the voluntary CASD process altogether and filed a civil action against the PWD. *See Levesque v. Cent. Me. Power Co.*, No. 2:19-cv-00389-JDL, 2020 U.S. Dist. LEXIS 250179, at *20 (D. Me. Nov. 25, 2020).

itself,[9] the customer is again afforded "a procedure for appeal of the decision to the commission." 35-A M.R.S. § 704(2); PUC § 13(H); *see supra* n.7.

- After the Commission reviews the summary investigation, it may affirm the CASD's decision; remand to the CASD for reconsideration or to gather more information; issue an order reversing or altering the CASD's decision; or, "[i]f . . . the commission is satisfied that sufficient grounds exist to warrant a formal public hearing as to the matters investigated," open a formal investigation and hold a hearing pursuant to 35-A M.R.S. § 1303(2). *See* PUC § 13(H)(4).

- The customer, if dissatisfied by the CASD's summary investigation and the Commission's subsequent review, is not precluded from then filing a civil lawsuit against the utility. *See* 35-A M.R.S. § 1501 (2021); *Pub. Utils. Comm'n*, Investigation Into Central Maine Power Company's Metering and Billing Issues, No. 2019-00015, Order at 76 (Me. P.U.C. Feb. 26, 2020); *Levesque v. Cent. Me. Power Co.*, No. 2:19-cv-00389-JDL, 2020 U.S. Dist. LEXIS 250179, at *20 (D. Me. Nov. 25, 2020).

[¶7]  This procedure has, as intended by the Commission, resulted in an oft-used, informal process that benefits utility customers.  According to the PUC's 2020 annual report to the Legislature, the CASD received 1,793 complaints in 2019, decreasing to a still-substantial 759 complaints in 2020 during the pandemic with its associated moratorium on utility disconnections.

---

[9] The CASD is not independent of the Commission but rather is a subsidiary of it, and the CASD specialist who informally investigated General Marine's dispute with the PWD is a PUC staff member, not a member of the Commission empowered by the Legislature to finally resolve disputes involving utilities.  *See* 35-A M.R.S. §§ 103(1), (2)(A)-(B), 107(1)(A), (4) (2021) (providing that the director of consumer assistance and safety is appointed by the Commission and is a member of the Commission's staff); PUC § 2(H) (providing that the CASD "is a division of the Commission").

8

State of Maine Public Utilities Commission, 2020 Annual Report to the Maine Legislature at 52 (Feb. 1, 2021).[10]

[¶8] It is simple logic that if the CASD is not able to informally and quickly collect information from sources that it "deems relevant to the [customer's] complaint," PUC § 13(G)(2)(c)—including through "informal meeting[s] with the customer and/or the utility," PUC § 13(G)(2)(a)—but must instead resort to discovery and other procedures more akin to civil litigation, then it will be unable to respond in a timely way to the hundreds or thousands of complaints filed each year by ordinary citizens seeking help with their utility bills. As the Commission states in its brief: "If the CASD process was a formal adjudication it would not serve the purpose it was created to serve: provide a rapid, inexpensive, low-barrier way for financially distressed customers to keep their lights on, heat their homes, keep water coming out of their taps, and reasonably pay their bills."

[¶9] We conclude that in permitting the PUC to conduct summary investigations of billing disputes and to then exercise its broad discretion in

---

[10] It is worth noting that the Commission's 2021 annual report states that the number of complaints to the CASD climbed to 830 in 2021. State of Maine Public Utilities Commission, 2021 Annual Report to the Maine Legislature at 48-49 (Feb. 1, 2022). More recently, the *Bangor Daily News*, citing a PUC spokesperson, reported that the CASD had received 399 calls for assistance in the first half of February 2022 alone. Sawyer Loftus, *Mainers Shocked by Skyrocketing Electric Bills*, Bangor Daily News (Feb. 16, 2022), https://bangordailynews.com/2022/02/16/news/higher-electric-bills-react-joam40zk0w/).

deciding whether to hold a formal public hearing, *see* 35-A M.R.S. §§ 104, 1301, 1303, the Legislature intended to allow the type of voluntary, informal process created by chapter 660 of the Commission's Rules. *See Desgrosseilliers v. Auburn Sheet Metal*, 2021 ME 63, ¶ 8, 264 A.3d 1237 ("Our main objective in construing any statute is to give effect to the will of the Legislature.").

[¶10] The full, formal procedure associated with civil litigation remains available to any utility customer who elects to invoke it, *see* 35-A M.R.S. § 1501, including General Marine, a sophisticated, well-represented litigant with a complex billing dispute that chose to pursue the informal CASD process to resolve its dispute rather than commence a civil suit.[11] The complexities and nuances of this dispute are in stark contrast to an individual utility customer who simply wishes to have a billing error reviewed by the Commission and settled under its auspices.

## B.     General Marine's Appeal Is Not Authorized by Statute

[¶11] Pursuant to 35-A M.R.S. § 1320(1), "[a]n appeal *from a final decision* of the commission may be taken to the Law Court." (Emphasis added.)

---

[11] Neither the result of the CASD's informal investigation nor the Commission's election not to formally investigate the matter further preclude resolution of the dispute in another forum. *Cf. U.S. Bank, N.A. v. Tannenbaum*, 2015 ME 141, ¶ 6, 126 A.3d 734 ("Res judicata bars the relitigation of claims if . . . a valid *final judgment* was entered in the prior action . . . ." (emphasis added) (quotation marks omitted)).

Here, the Commission, adhering to the statutory and regulatory process discussed above, considered the results of the CASD's investigation, noting that "[t]he CASD complaint process is not an adjudicatory process and instead allows the CASD to informally investigate the complaint" before ultimately "declin[ing] to investigate the matter further." *Gen. Marine Constr. Corp.*, Appeal of CASD Decision, No. 2019-00293, Order at 3, 7 (Me. P.U.C. May 27, 2020).

[¶12] Had the Commission opened a formal investigation in the exercise of its discretion and held a public hearing, *see* 35-A M.R.S. §§ 1303(2), 1304 (2021), the resulting adjudicatory decision could have constituted a "final decision" cognizable on appeal, *see* 35-A M.R.S. § 1320(1). Instead, the Commission elected not to formally investigate General Marine's complaint following the CASD's review and did the opposite, "declin[ing] to investigate the matter further." *Gen. Marine Constr. Corp.*, Appeal of CASD Decision, No. 2019-00293, Order at 7 (Me. P.U.C. May 27, 2020). Because the PUC did not issue a "final decision" at the conclusion of the informal process authorized by statute and established by rule, section 1320(1) did not authorize General Marine's appeal to this Court, and therefore we must dismiss it.

The entry is:

Appeal dismissed.

_____

CONNORS, J., with whom HUMPHREY and HORTON, JJ., join, dissenting.

[¶13]  The Court dismisses this appeal because it concludes that the Consumer Assistance and Safety Division (CASD) process is an "informal dispute resolution alternative."  Court's Opinion ¶ 5.  In the Court's view, the Public Utilities Commission's decision affirming the CASD decision was not on the merits and is judicially unreviewable because it was not a "final decision" as that term is used in 35-A M.R.S. § 1320(1) (2021).  Court's Opinion ¶¶ 1, 5, 12.  The Court reaches this conclusion for two reasons: (1) the CASD review must be informal because the number of customer complaints received by the Commission makes it impractical to provide the full adjudicatory process set forth in the Maine Administrative Procedure Act (APA), *see* 5 M.R.S. § 9056 (2021), and (2) the use of the word "appeal" in sections 704 and 1308 of Title 35-A should be construed to mean a customer's request for the Commission to open an investigation on its own motion pursuant to 35-A M.R.S. § 1303 (2021), *see* 35-A M.R.S. §§ 704, 1308 (2021).  *See* Court's Opinion ¶¶ 6 n.7, 8-9.

12

[¶14] Because I believe that the Court misapprehends the framework for reviewing customer complaints under Title 35-A and, more specifically, the legislative intent in enacting a customer's right to appeal under sections 704 and 1308, I respectfully dissent.

## I. BACKGROUND

### A. The Substance and Effect of a CASD Decision

[¶15] An understanding of the CASD process, the content of a CASD decision, and the regulatory impact of a CASD decision is necessary for an understanding of the issues raised by this appeal.

[¶16] Under the process set out by 35-A M.R.S. § 1308,[12] when a customer disputes a utility's bill, the customer must first attempt to settle the dispute at an "informal hearing" with the utility. If the customer is not satisfied with the result of this informal hearing, the customer may "appeal" the utility's

---

[12] Title 35-A § 1308 (2021) provides:

**§ 1308. Reparation or adjustment**

The commission may order reparation or adjustment when it finds that an amount charged to or collected from a customer was not in accordance with the filed rate applicable to the customer or was based upon error. The customer shall attempt to settle any dispute concerning the alleged overcharge or billing error at an informal hearing with the utility company prior to filing a complaint with the commission. If the customer is dissatisfied with the utility company's decision, the customer may appeal the decision to the commission. The commission may not order a rebate for a billing error or excessive charge that antedates the order for more than 6 years.

decision to the Commission by filing a complaint with the CASD, which will investigate and issue its own written "decision."[13] *Id.*; 65-407 C.M.R. ch. 660, § 13(G) (effective Aug. 28, 2011).[14]

[¶17]   Either the customer or the utility can then appeal the CASD's decision to the Commission, which will "review the decision to determine if it complies with applicable statutory and regulatory requirements, is based on sound facts, and does not represent an abuse of discretion."   65-407 C.M.R. ch. 660, § 13(H)(1), (3).  The Commission will then issue an order affirming the CASD's decision, remanding the customer complaint, reversing or revising the decision, or opening an investigation pursuant to 35-A M.R.S. § 1303. 65-407 C.M.R. ch. 660, § 13(H)(4).

[¶18]   Thus, as with the initial appeal to the CASD, under section 1308 and the Commission's regulations, when a customer exercises its right to appeal the CASD decision, the Commission reviews the billing dispute on the merits and determines which party should prevail.

---

[13]  The CASD process applies not just to water service but to any public utility service, such as electricity. *See, e.g.*, 65-407 C.M.R. ch. 815, § 13 (effective Jan. 9, 2022).

[14]  Citations to chapter 660 of the Commission's regulations are to the version of the regulations that was in effect when the CASD issued its decision.  *See* 65-407 C.M.R. ch. 660 (effective Aug. 28, 2011).  Portions of chapter 660 have since been amended, but the amendments do not affect the issues on appeal.  *See* 65-407 C.M.R. ch. 660 (effective Apr. 28, 2020).

14

[¶19]  Importantly, the pursuit of a CASD appeal and its outcome have a regulatory effect.  When a customer files an appeal with the CASD, the utility is prohibited from shutting off the customer's service.  65-407 C.M.R. ch. 660, § 13(F)(1).  If, at the end of the section 1308 regulatory review, the Commission agrees with the customer on the merits, then the utility is foreclosed from shutting off the customer's service for not paying the bill; conversely, if the Commission agrees with the utility, then the regulatory prohibition against terminating the customer's service is lifted if the customer does not pay what the Commission decides is owed.[15]  *See* 35-A M.R.S. § 704(1), (2); 65-407 C.M.R. ch. 660, § 13(F)(1)-(2), (H)(2).

[¶20]  The billing dispute between General Marine and the Portland Water District (PWD) adhered to this process by which the Commission decides the merits of a billing dispute and whether to grant regulatory approval for a utility to terminate a customer's service.  Based on its conclusion that General Marine had used water from an unmetered connection, PWD issued General Marine a bill for $15,803.70.  In a letter detailing the charge, PWD noted that, if the parties could not resolve the issue, General Marine "ha[s] the right to submit

---

[15]  The Commission and PWD acknowledge that the CASD process precludes, as a regulatory matter, the termination of a customer's service unless or until the utility prevails in the Commission's review of the billing dispute.

the dispute to the [CASD]." After attempting to settle the dispute informally with PWD, General Marine appealed to the CASD.

[¶21] Consistent with the Commission's regulations, *see* 65-407 C.M.R. ch. 660, § 13(G)(2)-(3), the CASD's investigation of General Marine's complaint was conducted largely ex parte: the investigator requested specific information and records from PWD, exchanged emails with representatives of both parties, and might have spoken with each party outside of the other's presence. As the Commission concedes, this review process does not comport with minimum administrative due process, largely because each party does not have an opportunity to rebut the other party's position.[16] After its ex parte review, the CASD issued a written decision on the merits containing its findings of fact and ruling that PWD's bill was supported in full by those facts and the law.

[¶22] Consistent with section 1308, *see supra* n.12, the CASD's decision contained a provision notifying General Marine of its right to appeal the decision to the Commission and instructed that if General Marine did so, "[t]he Commission shall review the decision to determine if the CASD decision is

---

[16] The traditional minimum indicia of due process include adequate notice, a neutral decision maker, the right to present evidence and legal argument, and a transparent process with the ability to rebut opposing evidence and argument. *See Jusseaume v. Ducatt*, 2011 ME 43, ¶ 12, 15 A.3d 714; *Geary v. Dep't of Behav. & Developmental Servs.*, 2003 ME 151, ¶ 19, 838 A.2d 1162; *Mutton Hill Ests., Inc. v. Town of Oakland*, 468 A.2d 989, 992 (Me. 1983).

16

correct. It can uphold the decision, reverse it, or send it back to [the] CASD for further action." General Marine appealed to the Commission, and the Commission reviewed the CASD decision to determine whether it was correct on the facts and law while again not conforming with the minimum requirements of administrative due process.

[¶23] The Commission then issued an order that stated that it was "uphold[ing]" the CASD's decision. Contrary to how the Court interprets the Commission's decision, *see* Court's Opinion ¶¶ 1, 12, the order issued by the Commission was, like the CASD's decision, on the merits: it was detailed and set forth findings of fact about the merits of the billing dispute.[17] When General

---

[17] The Commission ruled, in the section entitled "Decision":

The Commission makes no finding of when or by whom the unauthorized connection was made, or whether it existed prior to the property being purchased by the current owners. What is clear, however, is that [General Marine] benefitted from unmetered water usage and that since at least 2008, it was provided notice that PWD knew of no such domestic connection or flat fee arrangement nor would it allow such a connection. For those reasons the Commission finds that the unmetered 2" domestic connection was unauthorized, which is defined by Chapter 660 of the Commission's Rules as "interference or diversion of utility service" and includes "by-passing the meter" (unmetered service that flows through a device connected between the service line and customer-owned facilities.) Because the connection was unauthorized, PWD is allowed to issue a make-up bill under Chapter 660, § 8(E)(1).

The Commission also finds that PWD billed [General Marine] correctly when it calculated the make-up bill. While [General Marine] argues that it was not given credit for the monthly flat fee it had already paid, PWD confirms that [General Marine] was credited for the monthly fire protection service. The make-up bill was calculated for consumption charges outside of the fire protection charge. Finally, as PWD notes, the make-up bill most likely under-estimates usage and does not take into account

Marine requested reconsideration of the Commission's decision, which the Commission denied, the Commission noted that "[b]oth the CASD decision and the [Commission's] [o]rder found" that General Marine had an unauthorized connection and again rejected General Marine's arguments as to why the calculation of the amount owed was incorrect.

[¶24] In sum, pursuant to the procedures governing General Marine's exercise of its right under section 1308 to appeal PWD's decision, the review process involved Commission staff, and then the Commission itself, issuing "decisions" with many findings of fact as to the merits of the billing dispute. This exercise in determining which party should prevail culminated in a regulatory approval for PWD to terminate General Marine's service unless General Marine paid PWD the amount that the Commission ordered was due. The entirety of this fact-finding process resulting in this regulatory approval was undertaken without conforming to minimum administrative due process.

[¶25] None of the regulatory decisions issued by the CASD and the Commission cite 35-A M.R.S. § 1303, which the Court relies upon to characterize

---

the fact that [General Marine] kept the water running 24 hours a day during the winter.

The Court's characterization of the Commission's decision as an informal, nonfinal decision not on the merits, Court's Opinion ¶¶ 1, 12, is also at odds with the Commission's briefing before us, which repeatedly refers to the factual findings made during its review of the CASD's decision and characterizes its order as "upholding" the CASD's decision.

General Marine's appeal as a request for the Commission to open an investigation. Court's Opinion ¶¶ 6, 9, 12. Nor in its appeal to the CASD or the Commission did General Marine ask the Commission to open an investigation pursuant to section 1303.

## B. The Title 35-A Framework for Review of Customer Complaints

### 1. Sections 1308 and 704

[¶26] As noted above, *see supra* n.12, section 1308 is the provision in Title 35-A that deals specifically with billing disputes. Entitled "Reparation or adjustment," it bestows upon customers the right to "appeal" a utility bill after the utility holds an "informal hearing" as to whether an error has occurred. *Id.*

[¶27] Section 704 is entitled "Termination of utility services." 35-A M.R.S. § 704. With respect to terminations of residential customer service, the statute echoes section 1308 and provides that the Commission must enact regulations which provide for the "right" of the customer to settle any dispute concerning a proposed disconnection "at an informal hearing" with the utility. *Id.* § 704(1). After that step, the customer has the right "to appeal the results of that utility's decision to the [C]ommission." *Id.* With respect to nonresidential customers, the utility must file its terms and conditions applicable to termination with the Commission, and it cannot terminate service to a

nonresidential customer if the Commission or its delegate issues a "rul[ing]" that the termination is not in accord with the utility's terms or conditions. *Id.* § 704(2). If the Commission authorizes a delegate to resolve such disputes, there must be a procedure for "appeal" of that decision to the Commission. *Id.*

[¶28] Thus, Title 35-A specifically addresses billing disputes by providing a right to "appeal" to the Commission under sections 1308 and 704. In that appeal, the Commission reviews the merits and issues a decision that determines whether the utility may, as a regulatory matter, terminate the customer's service. *See* 65-407 C.M.R. ch. 660, § 13(H).

2. **Sections 1302 and 1303**

[¶29] In contrast to sections 1308 and 704, which specifically address billing disputes and service terminations, sections 1302 and 1303 address the Commission's broad investigatory powers over utility practices. *See* 35-A M.R.S. §§ 1302, 1303 (2021). Section 1302 provides:

> When a written complaint is made against a public utility by 10 persons aggrieved that the rates, tolls, charges, schedules or joint rate or rates of a public utility are in any respect unreasonable or unjustly discriminatory; that a regulation, measurement, practice or act of a public utility is in any respect unreasonable, insufficient or unjustly discriminatory; or that a service is inadequate or cannot be obtained, the commission, being satisfied that the petitioners are responsible, shall, with or without notice, investigate the complaint.

35-A M.R.S. § 1302(1). Because a minimum of ten people must file such a complaint, this statute does not focus on a dispute with one customer claiming a factual billing error but rather relates to utility rates or practices affecting more than one individual, as also reflected by the list of subject matters about which ten aggrieved persons may complain. *See id.*

[¶30] The next statutory provision, section 1303, provides that the Commission may "on its own motion" summarily investigate a utility when it believes that a rate or charge is unjust or unreasonable, a service is inadequate or cannot be obtained, or an investigation should be opened for any other reason. *Id.* § 1303(1). If, after a summary investigation, the Commission is satisfied that sufficient grounds exist to warrant a formal investigation, it then initiates a formal public hearing process, with the right to subpoena witnesses and opportunities to intervene. *See id.* § 1303(2).

[¶31] Nothing in Title 35-A prevents one customer from requesting that the Commission open a section 1303 investigation on the Commission's own motion. But there is no reason to think that a customer's *right to appeal* under the CASD process established under sections 704 and 1308 for resolving a claimed billing error is somehow a customer's *request* to the Commission to exercise its *discretion* to open a section 1303 investigation into a utility's rates

or practices. Similarly, there is no reason to interpret the Commission's affirmance of a CASD decision on the merits as a decision not to undertake a section 1303 investigation.

[¶32] The only relationship between section 1303 and sections 704 and 1308 is that the Commission can always choose to open a section 1303 investigation when, in the course of hearing a customer's section 1308 appeal, the Commission concludes that a broader investigation into the utility's general practices is warranted. *See Savage v. Cent. Me. Power Co.*, No. BCD-CV-2017-61, 2018 Me. Bus. & Consumer LEXIS 29, *10 (June 15, 2018) (describing section 1303 investigations started by CASD appeals relating to line extension policies); *Quiland, Inc. v. Pub. Utils. Comm'n*, 2007 ME 45, ¶¶ 7, 12, 917 A.2d 697 (describing a Commission investigation ordered after an appeal to the CASD); *see also Friedman v. Pub. Utils. Comm'n*, 2016 ME 19, ¶¶ 2, 5, 132 A.3d 183 (describing Commission investigations based on many customer smart-meter complaints); *cf. Pine Tree Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 631 A.2d 57, 60-61 (Me. 1993) (describing the Commission's opening of a section 1303 investigation after the filing of a twelve-person complaint based on the utility's general rates, revenues, and management policies).

[¶33] Accordingly, the only provision in the CASD regulations that cites section 1303 is the regulation describing the options that the Commission has in reviewing an appeal of a CASD decision. *See* 65-407 C.M.R. ch. 660, § 13(H)(4). That regulation provides that the Commission can affirm the CASD decision; reverse or alter the CASD decision; remand the complaint to the CASD; or issue an order opening a section 1303 investigation. *See id.* In this instance, given that the nature of the dispute was not a utility practice affecting multiple ratepayers but rather an alleged factual billing error affecting one customer, the Commission expressly chose the option of affirming and "uphold[ing]" the CASD's decision. Although the Commission also decided not to open a section 1303 investigation into PWD's practices, that does not detract from the fact that the Commission affirmed, on the merits, the CASD's decision as to the billing dispute.

[¶34] In sum, contrary to the Court's position, the issue here is not whether the Commission can exercise unreviewable discretion in choosing not to open an investigation into a utility's practices on its own motion under section 1303 if a customer requests such an investigation. *See* Court's Opinion ¶¶ 9, 12. Instead, the question is whether the Commission's decision as to who should prevail in an appeal of a CASD decision on a billing dispute when a

customer invokes its right to appeal is subject to judicial review and must be the product of an administrative process that accords with minimum due process.[18]

[¶35] For the many reasons described below, the answer to this question is yes: the Legislature intended the Commission's decision on the merits of a billing dispute and its regulatory approval to terminate a customer's utility service to be judicially reviewable and the product of administrative due process.

## II. DISCUSSION

[¶36] The Court concludes that the Commission's determination on the merits in the section 1308 appeal process is not intended by the Legislature to be reviewable by us or comport with administrative due process because (1) it would be impracticable to provide the full APA adjudicatory process to each customer complaint, and (2) the word "appeal" as used in sections 704 and 1308 should be viewed in this context as only requiring an "informal" process, the outcome of which we cannot review. *See* Court's Opinion ¶¶ 6 n.7, 8-9. As

---

[18] As the Court properly concludes, these two issues—judicial reviewability and the scope of the intended appeal process—are entwined. *See* Court's Opinion ¶¶ 5, 12. If an agency's decision is not a product of minimal due process, we cannot review its findings. *Cf.* 5 U.S.C.S. § 706(2)(E)-(F) (LEXIS through Pub. L. No. 117-80); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414-15, 420 (1971); *Ramsey v. Hercules Inc.*, 77 F.3d 199, 205 (7th Cir. 1996) ("Underlying the deferential review that fact findings of [administrative law judges, agencies, or federal district courts] enjoy is a well established set of procedural protections that stem from the Constitution and individual statutes.").

explained below, the first reason is inapposite because it is based on an incorrect premise: that all reviewable regulatory decisions are subject to the APA. The second reason fails to recognize the plain language of the statute or apply any rule of statutory construction were this language deemed ambiguous.

**A.** **The numerosity of customer complaints does not support the conclusion that the Commission's decision in a section 1308 appeal is unreviewable and need not comport with minimum administrative due process.**

[¶37] The Court overlooks the clear indicators of legislative intent discussed below because of its concerns about the feasibility of requiring the rigorous procedures of administrative adjudications for every billing dispute. *See* Court's Opinion ¶¶ 7-8. But this argument is a straw man: just because an agency decision must comport with minimum administrative due process, it does not follow that this process must include the full panoply of process for adjudicatory proceedings required by section 9056 of the APA. *See Hale v. Petit*, 438 A.2d 226, 231 (Me. 1981) (concluding that the APA does not apply to the process for determining whether to issue a certificate of need); *Sanford Highway Unit of Loc. 481 v. Town of Sanford*, 411 A.2d 1010, 1014-15 (Me. 1980) (concluding that the APA's process does not apply to the municipal labor relations sphere). Notably, when elsewhere in Title 35-A the Legislature intended the Commission's process to comply with section 9056, it expressly

said so. *See, e.g.*, 35-A M.R.S. § 1304(4) (2021). Neither section 1308 nor 704 includes such an indication.

[¶38] It would be relatively simple to adjust the existing CASD process to include the traditional components of minimal due process needed to make its decision judicially reviewable. The primary flaw in the current process is the customer's inability to rebut evidence presented to the CASD investigator. The existing process could be amended to prohibit substantive ex parte communications between the CASD and the parties if initial attempts to settle the dispute informally fail.[19]

---

[19] The process created by the Massachusetts Department of Public Utilities (DPU) is one potential model for the Commission to emulate. In Massachusetts, the utility customer first engages in an internal dispute resolution process with the utility. 220 Mass. Code Regs. 25.02(4)(a) (LexisNexis 2022). If the customer is dissatisfied and chooses to appeal, a DPU representative investigates and holds a nonadjudicatory hearing in which each side has the opportunity to be heard. *Id.* 25.02(4)(b). Once the representative rules on the appeal, the customer and utility are notified of their right to appeal the decision to the DPU for a full adjudicatory hearing. *Id.* Although Massachusetts's process goes beyond what is required under Maine law in that it provides for an adjudicatory hearing if ultimately requested, *see id.*, it provides a useful framework for a procedure that meets the Commission's constitutional and statutory obligations. The DPU received and addressed 4,286 complaints in 2020 without apparent difficulty. *See* Mass. Dep't of Pub. Utils., Ann. Rep. 7 (2020), https://www.mass.gov/doc/dpu-annual-report-2020/download.

**B.** **The application of every tool of statutory construction results in an interpretation of the governing statutes that reflects the Legislature's intent to provide a reviewable appeal mechanism comporting with minimum administrative due process.**

    **1.** **The plain language of 35-A M.R.S. §§ 704, 1308, and 1320 supports the conclusion that a Commission decision affirming a CASD decision rejecting a customer's section 1308 appeal is judicially reviewable and must comport with the traditional components of administrative due process.**

[¶39] The construction of a statute begins with its language. *See Murphy v. Bd. of Env't Prot.*, 615 A.2d 255, 258 (Me. 1992). We must "consider the whole statutory scheme for which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved." *Stromberg-Carlson Corp. v. State Tax Assessor*, 2001 ME 11, ¶ 9, 765 A.2d 566 (quotation marks omitted).

    **a.** **Section 1320**

[¶40] Section 1320 is the provision in Title 35-A setting out which actions of the Commission are reviewable by us on appeal. As noted above, if an agency decision is judicially reviewable, then it needs to be the product of minimum administrative due process. *See supra* n.18. Hence, if the Commission's decision here falls within the language of section 1320 as a decision reviewable by us, it follows that the Commission's ruling is not simply an unreviewable exercise of informal alternative dispute resolution.

[¶41] Section 1320(1) provides that appeals from "final decision[s]" of the Commission may be taken to the Law Court. The Commission's affirmance of the CASD decision falls within the plain meaning of section 1320(1) because, as is clear from the Commission's order, the Commission issued a "decision" within the ordinary meaning of the term. *See Decision*, Black's Law Dictionary (11th ed. 2019) (defining "decision" as "[a] judicial or agency determination after consideration of the facts and the law").[20] The Commission's decision was "final" because there was no further recourse in front of the Commission to challenge that decision.

[¶42] The Court asserts that the Commission's decision was not a final decision based on the reasoning that, because the Court deems that the decision is unreviewable and need not comport with due process, it must not be a final decision. *See* Court's Opinion ¶¶ 8-12. This reasoning is circular and overlooks the plain language of section 1320. Although it is true that decisions that do not comply with due process are generally not proper subjects for judicial review because of a reviewing court's inability to apply the substantial evidence test, *see supra* n.18, the fact that the Commission failed to provide due process does

---

[20] *See* 1 M.R.S. § 72(3) (2021) ("Words and phrases shall be construed according to the common meaning of the language. Technical words and phrases and such as have a peculiar meaning convey such technical or peculiar meaning.").

not necessitate the conclusion that the Legislature intended the process to be unreviewable.

[¶43] The Court also overlooks the fact that section 1320 provides for judicial review of even nonfinal decisions when "the constitutionality of any ruling or order of the [C]ommission is in issue." 35-A M.R.S. § 1320(5).[21] On appeal, General Marine argues that the CASD regulations violated constitutional due process requirements. Although this constitutional issue need not be reached because the Legislature intended as a matter of statute that the CASD comport with the traditional components of administrative due process, General Marine's challenge to the constitutionality of the CASD process still makes its appeal reviewable by us under the language of section 1320(5). *See Hannum v. Bd. of Env't Prot.*, 2003 ME 123, ¶ 18, 832 A.2d 765.

### b.    Sections 704 and 1308

[¶44] The construction of sections 704 and 1308 again starts with their plain language, which is the "best indicator" of legislative intent. *Wawenock, LLC v. Dep't of Transp.*, 2018 ME 83, ¶ 7, 187 A.3d 609; *see Murphy*, 615 A.2d at 258.

---

[21] The Commission's decision was a "ruling" in addition to being a "decision." *See Ruling*, Black's Law Dictionary (11th ed. 2019) (defining "ruling" as "[t]he outcome of a court's decision either on some point of law or on the case as a whole"); *Ruling*, American Heritage Dictionary of the English Language (5th ed. 2016) (defining "ruling" as "[a]n authoritative or official decision").

[¶45]  The language used by the Legislature in sections 704 and 1308 to refer to the various steps of the process—"decision," "complaint," "order," and "appeal"—aligns with the common understanding of administrative decision-making that must comport with due process.[22]

[¶46]  We also know that the process before the Commission must involve more than just an informal hearing because these two statutes provide for an informal hearing before the utility followed by a right to file an appeal to the Commission.  *See* 35-A M.R.S. §§ 704, 1308.  Given that the Legislature expressly described the hearing before the utility as "informal" and did not use that same language when describing the process before the Commission, we presume that a different meaning was intended.  *See Desgrosseilliers v. Auburn Sheet Metal*, 2021 ME 63, ¶ 14, 264 A.3d 1237; *see also Fair Elections Portland,*

---

[22] A "complaint" is "[t]he initial pleading that starts a civil action and states the basis for the court's jurisdiction, the basis for the plaintiff's claim, and the demand for relief." *Complaint*, Black's Law Dictionary; *see also Complaint*, Ballentine's Law Dictionary (3d ed. 1969) (defining "complaint" as "a pleading by which the plaintiff in a civil action, whether of a legal or equitable nature, sets out the cause of action and invokes the jurisdiction of the court"). An "appeal" is "[a] proceeding undertaken to have a decision reconsidered by a higher authority; esp., the submission of a lower court's or agency's decision to a higher court for review and possible reversal." *Appeal*, Black's Law Dictionary; *see also Appeal*, Webster's New World College Dictionary (5th ed. 2016) (defining "appeal" as "the submission of a lower court's ruling, verdict, etc. to a higher court for review" including "the right to do this"). A "decision" is "[a] judicial or agency determination after consideration of the facts and the law." *Decision*, Black's Law Dictionary; *see also Decision*, Ballentine's Law Dictionary (defining "decision" as "[t]he report of a conclusion reached, especially the conclusion of a court in the adjudication of a case or the conclusion reached in an arbitration"). An "order" is "[a] command, direction, or instruction." *Order*, Black's Law Dictionary; *see also Portland Pipe Line Corp. v. City of S. Portland*, 2020 ME 125, ¶ 18, 240 A.3d 364.

*Inc. v. City of Portland*, 2021 ME 32, ¶ 29, 252 A.3d 504 ("[C]ourts presume that when a legislature uses different words within the same statute, it intends for the words to carry different meanings.").

> 2. **The purpose and legislative history of sections 704 and 1308 support the conclusion that the Legislature intended the CASD appeal process to be judicially reviewable and comport with the traditional components of administrative due process.**

[¶47] Although we need not look beyond this plain language, the purpose and legislative history of sections 704 and 1308 confirm the conclusion that the Legislature intended the Commission to make a decision on the merits which, like other agency decisions, must be the product of minimum administrative due process. *See Narowetz v. Bd. of Dental Prac.*, 2021 ME 46, ¶ 26, 259 A.3d 771; *Dickau v. Vt. Mut. Ins.*, 2014 ME 158, ¶ 21, 107 A.3d 621.

[¶48] The Legislature enacted the relevant amendment to section 1308, providing for administrative review, one year after the United States Supreme Court decided *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1 (1978). *See* P.L. 1979, ch. 361 (effective Sept. 14, 1979). In *Memphis Light*, the Supreme Court held that because Tennessee law provided that a public utility may not cut off service when a customer has a bona fide dispute concerning the correctness of its bill, a customer with a bona fide billing dispute has a legitimate claim of entitlement protected by the Due Process Clause of the

Fourteenth Amendment. 436 U.S. at 9-12. The Supreme Court then found that the notice provided to public utility customers violated due process because it failed to provide notice reasonably calculated to apprise customers of a pre-deprivation procedure for challenging a bill and a pre-deprivation opportunity to present their case. *Id.* at 14-16. The minimum process that the Supreme Court identified as necessary under the federal Due Process Clause was an informal hearing before a designated utility employee empowered to resolve the dispute in advance of the date of termination. *Id.* at 16 & n.17, 18, 21-22.

[¶49] Elaborating on the need for a pre-deprivation procedure, the Supreme Court noted that even though the customer could seek a remedy in court, including an injunction, the availability of this judicial avenue was constitutionally deficient and not viable given the small sum of money usually at stake, which discourages the customer from engaging counsel or bringing a lawsuit. *Id.* at 20-21. The Supreme Court further noted that an injunctive remedy was not an adequate substitute for an administrative process, given that such court remedies "were likely to be too bounded by procedural constraints and too susceptible of delay to provide an effective safeguard against an erroneous deprivation." *Id.* at 20.

32

[¶50] Given that the decision in *Memphis Light* required only an informal hearing before the utility, *see id.* at 16, 21-22, it is logical to conclude that the language in the Maine statutory framework enacted the next year requiring that the "informal hearing" before the utility be followed by a right to "appeal" to the Commission, *see* P.L. 1979, ch. 361 (effective Sept. 14, 1979), reflects a legislative intent to meet the minimum federal constitutional demand for an informal hearing before the utility and then additionally to provide for an administrative appeal of the utility's decision capable of judicial review and comporting with traditional administrative due process requirements.[23]

---

[23] The legislative history of 35-A M.R.S. § 704 (2021) also supports an interpretation that due process protections are intended. Section 704 was first enacted in 1975 for residential customers. *See* P.L. 1975, ch. 548 (effective Oct. 1, 1975). A relevant statement of fact for one version of the statute prior to final enactment provided, "The purpose of this bill is to establish a uniform method for terminating utilities to customer[s] for nonpayment. These procedures will, to the extent possible, assure that Maine consumers receive vital utilities and that arbitrary disconnections or terminations will not occur." L.D. 1663, Statement of Fact (107th Legis. 1975). Later amendments further underscored that the statute was intended to protect customers, both residential and nonresidential, from having their utility service mistakenly disconnected over billing disputes. *See* L.D. 958, Statement of Fact (111th Legis. 1983). Like section 1308, therefore, section 704 was enacted in part to create a protective administrative process beyond that required by *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 18, 21-22 (1978). Nothing in this legislative history suggests the creation of an unreviewable alternative dispute resolution mechanism lacking ordinary administrative due process protections.

**3. Other rules of statutory construction and principles of administrative law support the conclusion that the Legislature intended the CASD appeal process to be judicially reviewable and comport with the traditional components of administrative due process.**

[¶51] It is a black letter rule that statutes should be interpreted to avoid a danger of unconstitutionality. *See Town of Baldwin v. Carter*, 2002 ME 52, ¶ 12, 794 A.2d 62. Although the Supreme Court concluded that an informal hearing before the utility is sufficient to comport with the requirements of the Fourteenth Amendment, *see Memphis Light*, 436 U.S. at 16, 21-22, we have never concluded that a process involving a self-interested decision maker and lacking the other traditional components of procedural due process meets the due process requirements of the Maine Constitution.

[¶52] Similarly, "[a]lthough the [L]egislature is free to abrogate a long-standing rule of common law, such an intent is not to be presumed in the absence of clear and explicit language." *Atl. Oceanic Kampgrounds, Inc. v. Camden Nat'l Bank*, 473 A.2d 884, 886 (Me. 1984). In *Wood v. City of Auburn*, 87 Me. 287, 290-93, 32 A. 906 (1895), decided prior to the creation of the Commission, we held that before a utility could terminate service, the utility would need to instigate a court action and obtain an adjudication in its favor. In so ruling, we stated:

The parties are not upon equal ground. The city, as a water company, cannot do as it will with its water. It owes a duty to each consumer. The consumer once taken on to the system, becomes dependent on that system for a prime necessity of business, comfort, health and even life. He must have the pure water daily and hourly. To suddenly deprive him of this water, in order to force him to pay an old bill claimed to be unjust, puts him at an enormous disadvantage. He cannot wait for the water. He must surrender and swallow his choking sense of injustice. Such a power in a water company or municipality places the consumer at its mercy. It can always claim that some old bill is unpaid. The receipt may have been lost, the collector may have embezzled the money; yet the consumer must pay it again and perhaps still again. He cannot resist lest he lose the water.

It is said, however, that the consumer can apply to the courts to recover back any sum he is thus compelled to pay, if it was not justly due from him; or, if he can show affirmatively that it is not a just claim against him, he can by judicial process restrain the company or municipality from shutting off the water. To oblige a person to follow such a course would be a violation of the fundamental juristic principle of procedure. That principle is, that the claimant, not the defendant, shall resort to judicial process;— that he who asserts something to be due him, not he who denies a debt, shall have the burden of judicial action and proof. It is only in the case of dues to the State that this principle is suspended.

*Id.* at 292-93, 32 A. 906; *see also City of Belfast v. Belfast Water Co.*, 115 Me. 234, 241, 98 A. 738 (1916).

[¶53]  The Legislature enacted sections 704 and 1308 in the context of this historical and jurisprudential backdrop. *See Doherty v. Merck & Co.*, 2017 ME 19, ¶ 19, 154 A.3d 1202 (citing *Musk v. Nelson*, 647 A.2d 1198, 1202 (Me. 1994) ("The Legislature is presumed to be aware of the state of the law

and decisions of this Court when it passes an act.")).  Hence, although we need not decide whether only an informal hearing before the utility would meet the due process requirements of the Maine Constitution, this historical context and common law supports the conclusion that the Legislature, in establishing the administrative right to appeal under sections 704 and 1308, did not intend that administrative appeal to deviate from the minimum due process that we have traditionally required for administrative decisions.[24]

[¶54]  Additionally, it is a general principle of administrative law that a "strong presumption" favors judicial review of administrative action, and an agency bears a "heavy burden" in attempting to show that the Legislature prohibited judicial review of the agency's compliance with a legislative mandate.  *See Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quotation marks omitted).  Accordingly, in Maine, as a general rule, administrative decisions are reviewable absent statutory language to the contrary, *see, e.g.*, 35-A M.R.S. § 3456(2) (2021), or if the decision being challenged is an act of prosecutorial discretion not to undertake an enforcement action, *see Salisbury*

---

[24] Other jurisdictions also have a common law rule that public utility service cannot be terminated while a bona fide dispute is pending.  *See* Annotation, *Right to Cut Off Water Supply Because of Nonpayment of Water Bill or Charges for Connections, Etc*, 28 A.L.R. 472 § I(b) (2021 update, originally published in 1924).

*v. Town of Bar Harbor*, 2002 ME 13, ¶¶ 10-11, 788 A.2d 598. Neither situation applies here.

4. **The regulatory effect of the Commission's decision in a section 1308 appeal supports the conclusion that the Legislature intended the CASD appeal process to be judicially reviewable and to comport with the traditional components of administrative due process.**

[¶55]   Finally, and perhaps most importantly, the effect of the Commission's decision indicates that the Legislature intended that decision to be judicially reviewable and to comport with minimum administrative due process.   *See Batchelder v. Realty Res. Hosp., LLC*, 2007 ME 17, ¶ 17, 914 A.2d 1116 ("[T]he meaning of a statute must be construed in light of . . . the consequences of a particular interpretation." (quotation marks omitted)).

[¶56]  The Court notes that after or in lieu of exercising its right to appeal to the Commission, a customer can go to court and file suit for breach of contract without the Commission's decision having res judicata effect in that court proceeding.  *See* Court's Opinion ¶¶ 6, 10 & n.11.  This observation is correct because an agency decision that does not comport with minimum due process is too unreliable to be given preclusive effect.[25]

---

[25] *See Town of Freeport v. Greenlaw*, 602 A.2d 1156, 1160 (Me. 1992) (holding that in order for res judicata to apply to administrative proceedings, the proceeding must entail the "essential elements of adjudication"); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 480-82 (1982) (holding that

[¶57]  But the fact that the Commission's decision would not have a res judicata effect does not mean that it has *no* effect.  Regardless of whether the Commission's decision would have a preclusive effect in a subsequent civil suit—an avenue that, as we suggested in *Wood*, 87 Me. at 293, 32 A. 906, and the Supreme Court noted in *Memphis Light*, 436 U.S. at 20-21, a customer is unlikely to pursue—the Commission's decision has an effect potentially more serious on the customer: regulatory approval to terminate the customer's utility service.  *See* 65-407 C.M.R. ch. 660, § 13(F)(1), (G)(4)(e), (H)(2).  That the Commission's decision may not technically have preclusive effect is cold comfort—literally—to a customer who watches as its faucets go dry or its lights go out.

[¶58]  Indeed, the primary justification for not giving preclusive effect to an agency decision that is not the product of minimum due process— unreliability, *see Nasem v. Brown*, 595 F.2d 801, 806 (D.C. Cir. 1979)— underscores why the Legislature intended a Commission decision with the regulatory effect of approving the termination of essential services to be judicially reviewable and to comport with the traditional components of due process.  This is especially true given the important rights at stake.  *See Memphis*

---

to provide a "full and fair opportunity to litigate" for the purposes of res judicata, the administrative proceeding must satisfy the minimum requirements of due process).

*Light*, 436 U.S. at 18 ("Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety."); *see also Wood*, 87 Me. at 292, 32 A. 906.

### III. CONCLUSION

[¶59]  In sum, there is no reason to conclude that the Legislature would want to exclude the Commission's decision from normal reviewability and reliability requirements.  Neither the language of the relevant statutes nor the application of any tool of statutory construction supports such a conclusion.  For the reasons noted above, I do not believe that the Legislature, in mandating a right to appeal a utility's decision to the Commission before that customer's essential services can be terminated, intended a judicially unreviewable administrative review process in which the agency need not follow the minimal components of due process required for an agency's decision to be deemed reliable.

[¶60]  Accordingly, I respectfully dissent.

---

Edward S. MacColl, Esq. (orally), and Marshall J. Tinkle, Esq., Thompson, MacColl & Bass, LLC, P.A., Portland, for appellant General Marine Construction Corporation et al.

Leslie Raber, Esq. (orally), Mitchell Tannenbaum, Esq., Jordan McColman, Esq., and Amy Mills, Esq., Public Utilities Commission, Augusta, for appellee Maine Public Utilities Commission

Joseph G. Donahue, Esq. (orally), Preti Flaherty Beliveau & Pachios, LLP, Augusta, and Donna M. Katsiaficas, Esq., Portland Water District, Portland, for appellee Portland Water District

Public Utilities Commission case number 2019-00293
FOR CLERK REFERENCE ONLY